# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| Southern Industrial Contractors, LLC, | Civil Action No. 2:19-cv-1691-RMG |
| Plaintiff, | |
| v. | **ORDER AND OPINION** |
| O'Brien and Gere, Inc. of North America, and Western Surety Company, | |
| Defendants. | |

Before the Court are the parties' cross-motions for partial summary judgment. (Dkt. Nos. 84 and 86). For the reasons set forth below, the Court denies Plaintiff's motion for partial summary judgment and grants Defendants' motion for partial summary judgment.

## I.     Background

By written contract dated July 24, 2018, J.W. Aluminum, Inc. ("JWA") hired Defendant O'Brien and Gere, Inc. of North America ("Defendant OBG") to design and construct a private construction project known as the Boilermaker Expansion Project at JWA's facility in Berkeley County, South Carolina (the "Project"). *See* (Dkt. No. 50 ¶ 83). Defendant OBG's scope of work included design and construction services on two structures at JWA's facility—the Melt Building and the Rolling Mill Building. (*Id.* ¶ 84).

By written subcontract dated August 7, 2018, (the "Subcontract"), Defendant OBG subcontracted a portion of the scope of work on the Project to Plaintiff Southern Industrial Contractors, LLC for the lump sum of $2,860,432.00. (*Id.* ¶ 85). Plaintiff's original scope of work under the Subcontract was for it to construct a portion of the concrete foundation for the Melt Building only. (*Id.* ¶ 86); *see also* Subcontract, (Dkt. No. 86-3).

Subsequently, Defendant OBG requested that Plaintiff furnish a proposal to perform additional work items related to the sheet-pile cofferdam system on the Rolling Mill Building. *See* (Dkt. No. 85 at 2); (Dkt. No. 50 ¶¶ 92-93). Plaintiff furnished a proposal dated September 5, 2018 containing four cost items. (Dkt. No. 85-1). In early September 2018, Defendant OBG Project Manager Doug Feeney authorized Plaintiff to proceed with "driving sheet piles." Doug Feeney Deposition, (Dkt. No. 85-2 at 3-4) (testifying that Feeney authorized Plaintiff to begin "driving sheet piles" before "the change order was signed"); (Dkt. No. 50 ¶ 94) ("While OBG reviewed the cofferdam design, it permitted [Plaintiff] to perform limited mobilization and other design work based on [Defendant OBG's] feedback.").

Around October 26, 2018, Plaintiff "executed and returned to [Defendant OBG] the version of Change Order No. 1[1] provided by [Defendant OBG] . . . which increased the contract sum for the additional work relating to the Sheet Pile Cofferdam." *See* (Dkt. No. 10 ¶ 13). Change Order 1 ("CO1") provides that the "work [detailed therein] will be authorized in phases." (Dkt. No. 85-3 at 3). CO1 states that "[d]ue to various unknowns that cannot be clarified until design completion, [Plaintiff] would like to propose this work to be performed on a Time and Material (T&M) Basis with a Cost-Not-to-Exceed." (*Id.*). The four line items which comprise CO1's scope of work are: (1) "Sheet pile cofferdam around the rolling mill pit installation" with a cost-not-to-exceed of $1,356,000.00; (2) "Engineering Design Costs for designing the Sheet Pile Cofferdam System" with a cost-not-to-exceed of $46,000.00 including a "15% mark-up"; (3) "Permanent Sheet Pile materials" with a cost-not-to-exceed of $683,604.27; and (4) "W-Beams, Walers, and miscellaneous Structural Steel required to stiffen the cofferdam" at a unit cost of "$2.00 per pound

---

[1] A "Change Order" is defined as "a written order from the Contractor [Defendant OBG] to the Subcontractor [Plaintiff] directing an alteration or modification of the nature, scope or the type of work." (Dkt. No. 86-3 § 1.6)

(plus 15% mark-up)" with a cost-not-to-exceed of $2,205,102.00. (*Id.* at 3) (further providing a credit of $200,000.00 for the "[r]e-sell of Steel Material Scrap"). CO1 explicitly states that Defendant OBG "reserves the right to rescind this change order pending an audit of subcontractor's scope-of-work, unit pricing, and final costs." (*Id.* at 2).

On December 12, 2018, Defendant OBG signed CO1 after striking line item 4, reducing the value of CO1 from $4,090,706.27 to $1,885,604.27. (Dkt. No. 86-4). Defendant OBG argues that it struck line 4 because Plaintiff "submitted a waler design that [was] unworkable" and "defective." *See* (Dkt. No. 50 ¶¶ 145, 159); (*Id.* ¶ 97) ("After reviewing [Plaintiff's] proposed cofferdam design, which was received on October 12, 2018, [Defendant OBG] determined that the design did not work within other Project parameters; thus, [Defendant OBG] informed [Plaintiff] that it would not use [Plaintiff's] design and that [Defendant OBG] was removing line item number 4 . . . from CO#1's scope.").

On January 18, 2019, Plaintiff requested a punch list[2] for the sheet pile work under CO1 for line items 1 and 3 and confirmed Defendant OBG's "understanding . . . that the walers and cross beams will be installed by other contractors. Therefore, [Plaintiff] *currently have [sic] no remaining work* that can be performed . . . on the rolling mill pit cofferdam." (Dkt. No. 86-5 at 2) (emphasis added); *see also* (*id.*) (noting Plaintiff "would like to start disassembly of our onsite crawler cranes and demobilization of our equipment if [Defendant OBG] considers [Plaintiff's work] complete with the cofferdam installation"). On January 28, 2019, Defendant OBG sent a letter to Plaintiff conveying its understanding that Plaintiff had completed its work and was demobilizing. (Dkt. No. 86-6 at 2).

---

[2] A "punch list" is a "list of . . . jobs that will complete a project," especially "a roster of small but important jobs yet to be done on a construction site but necessary to be done before the construction can be considered completely finished." PUNCH LIST, Black's Law Dictionary (11th ed. 2019).

By letter dated February 8, 2019, Plaintiff objected to the removal of line item 4 from CO1 and invoked the dispute resolution procedures found at Article 26 of the Subcontract. (Dkt. No. 86-8). In its letter, Plaintiff argues that CO1's "cost-not-to-exceed" requirement applied to all work on CO1 and not the individual line items. (*Id.* at 2). Plaintiff argues that because CO1 was a time and materials change order and Defendant OBG had signed at least some of Plaintiff's daily time sheets, Defendant OBG owed Plaintiff for all costs incurred in performing the work associated with CO1. *See* (*id.*).³ Neither party disputes, however, that Plaintiff performed no work pertaining to line item 4 of CO1. *See* Sam Estis Deposition, (Dkt. No. 86-9 at 5) ("Q. But Mr. Estis, you never did install the walers, right? A: [Plaintiff] did not install the walers.").

On April 4, 2019, Plaintiff sent Defendant OBG a payment and demand letter pursuant to S.C. Code Ann. § 27-1-15. (Dkt. No. 86-15). On May 17, 2019, Defendant OBG responded to said letter. (Dkt. No. 86-17).

On April 8, 2019, Plaintiff sent notice that it was filing a mechanic's lien on the Project property pursuant to S.C. Code Ann. § 29-5-10, *et seq.* (Dkt. No. 86-11). The mechanic's lien filed by Plaintiff was in the amount of $5,039,693.01. (*Id.* at 2). On May 24, 2019, Plaintiff filed an

---

³ In its February 8, 2019 letter to Defendant OBG, Plaintiff writes, "Relying on this verbal approval, [Plaintiff] started mobilization and design work on September 11, 2018 and tracked our work on daily T&M timesheets which [Defendant OBG] approved and signed. On October 5, 2018, [Defendant OBG] sent [Plaintiff] an 'Intent of Award for the Sheet Piling work to support the Mill Building Foundations' and informed [Plaintiff] that this work would be awarded through a change order. Relying on this Intent of Award, [Plaintiff] continued performance on the cofferdam and continued tracking our work on daily T&M timesheets, and [Defendant OBG] continued approving and signing [Plaintiff's] daily T&M timesheets." (Dkt. No. 86-8 at 2); *see also* (*id.* at 3) ("Had [Plaintiff] been requested by [Defendant OBG] to only perform the sheet piling work without the walers and cross beams, [Plaintiff's] Proposal and Pricing as well as our means and methods would have been substantially different. Thus, [Plaintiff] has never accepted [Defendant OBG's] counter-offer of Change Order No. 1 offered by OBG on December 13, 2018."). In its letter, however, Plaintiff nowhere asserts that it performed any work pertaining to line item 4. *See* (*id.*).

Amended and Restated Notice and Certificate of Mechanic's Lien (the "Amended Lien") in the amount of $4,220,679.28, which Plaintiff claimed revised "the previously filed Mechanic's Lien to reflect the correct amount it has been paid by" Defendant OBG. (Dkt. No. 86-13 at 4).

On or about June 24, 2019, Defendant OBG discharged the Amended Lien by filing a surety bond (the "Lien Bond") issued by Defendant Western Surety Company ("Western"). (Dkt. No. 86-14).

On July 25, 2019, Plaintiff filed an amended complaint against Defendants OBG and Western (collectively "Defendants") alleging five causes of action: (1) breach of contract against Defendant OBG; (2) suit on a bond against Defendants OBG and Western; (3) unjust enrichment *quantum meruit* against Defendant OBG; (4) failure to investigate and pay per S.C. Code. Ann. § 27-1-15 against Defendant OBG; and (5) intentional interference with prospective contractual relations against Defendant OBG.

On October 6, 2020, Defendants filed an Amended Answer. (Dkt. No. 50). Defendants bring the following counterclaims: (1) breach of contract—delays and deficiencies; (2) breach of contract—defective work; (3) violation of S.C. Code Ann. § 29-5-100 for submitting an overstated lien; (4) violation of S.C. Code Ann. § 29-5-90 for submitting an overstated lien; (5) fraudulent misrepresentation; and (6) negligent misrepresentation.

On February 23, 2021, Plaintiff moved for partial summary judgment on Defendants' counterclaims. (Dkt. No. 84). First, to the extent Defendants' claims for breach of contract rely on CO1, Plaintiff moves for summary judgment on the basis that CO1 is not a valid contract. (Dkt. No. 85 at 4-9) (arguing that there was no "meeting of the minds" as to CO1). Second, Plaintiff argues it is entitled to summary judgment on certain aspects of Defendants' breach of contract claims. Specifically, Plaintiff argues it is entitled to summary judgment on these claims to the

extent that Defendants allege Plaintiff failed to furnish adequate waler designs for the sheet-pile cofferdam system—line item 4 of CO1—"as [Defendant OBG] lacks the requisite expert evidence to establish such a claim." (*Id.* at 1); *see* (Dkt. No. 50 ¶ 145) ("[Plaintiff] also submitted a waler design that proved unworkable, and that improper design further delayed both the completion of its work and the overall Project progression"); (*Id.* ¶¶ 157-159) (alleging that "[Plaintiff] failed to timely provide a waler design" and "[b]y submitting an untimely and defective waler design, [Plaintiff] delayed the Project and caused [Defendant OBG] to incur substantial damages"). Defendants oppose Plaintiff's motion. (Dkt. No. 92). Plaintiff filed a reply. (Dkt. No. 94).

On February 23, 2021, Defendants also moved for partial summary judgment. (Dkt. No. 86). Defendants argue as follows:

> (1) Defendants are entitled to summary judgment in part on Plaintiff's claim for breach of contract "because there is no genuine dispute of material fact that [Plaintiff] is . . . entitled to [no] more than $1,885,604.27 for the work it performed pursuant to CO1."
>
> (2) Defendants are entitled to summary judgment on Plaintiff's claim for suit on a bond "because there is no genuine dispute of material fact that [Plaintiff] willfully overstated the amount of its mechanic's lien."
>
> (3) Defendants are entitled to summary judgment on Plaintiff's claim for unjust enrichment "because South Carolina law requires dismissal of quasi-contract claims where an identical claim for breach of contract has been asserted."
>
> (4) Defendants are entitled to summary judgment on Plaintiff's claim for failure to investigate because "there is no genuine dispute of material fact that [Defendant OBG] timely investigated and responded to [Plaintiff's] claims within forty-five (45) days as required by S.C. Code § 27-1-15."
>
> (5) Defendants are entitled to summary judgment on Plaintiff's claim for intentional interference with prospective contractual relation because no evidence exists in the record to support this claim.

(Dkt. No. 86-1 at 6-7). Plaintiff opposes Defendants' motion except as to Plaintiff's claim for intentional interference with prospective contractual relations. (Dkt. No. 90 at 4) (noting

Defendants seek "the dismissal of [Plaintiff's] Count V, a claim for Intentional Interference with Prospective Contractual Relations. [Plaintiff] *does not oppose the dismissal of that claim*.") (emphasis added). Defendants have filed a reply. (Dkt. No. 93).

The parties' motions are fully briefed and ripe for disposition.

## II.     Legal Standard

To prevail on a motion for summary judgment, the movant must demonstrate that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment has the burden of identifying the portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [which] show that there is no genuine issue as to any material fact and that the moving part is entitled to a judgement as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 & n.4 (1986) (citing Rule 56(c)). The Court will interpret all inferences and ambiguities against the movant and in favor of the non-moving party. *U.S. v. Diebold*, *Inc.*, 369 U.S. 654, 655 (1962). Where the moving party has met its burden to put forth sufficient evidence to demonstrate there is no genuine dispute of material fact, the non-moving party must come forth with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Rule 56(e)). An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

## III.    Discussion

### a. The Parties' Respective Claims for Breach of Contract and the Enforceability of CO1

The Court first addresses whether CO1 is a binding contract.

Under South Carolina law, "[w]here the language of a contract is plain and capable of legal construction, that language alone determines the instrument's force and effect." *Jordan v. Sec. Grp., Inc.*, 428 S.E.2d 705, 707 (S.C. 1993). In such instances, "the court's only function is to interpret its lawful meaning, discover the intention of the parties as found within the agreement, and give effect to it." *Heins v. Heins*, 543 S.E.2d 224, 230 (S.C. Ct. App. 2001). "The court must enforce an unambiguous contract according to its terms, regardless of the contract's wisdom or folly, or the parties' failure to guard their rights carefully." *Ellie, Inc. v. Miccichi*, 594 S.E.2d 485, 493 (S.C. Ct. App. 2004).

"Under South Carolina law, a contract is formed between two parties when there is, *inter alia*, 'a mutual manifestation of assent to [its] terms.'" *Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 236 (4th Cir. 2019); *see also Sauner v. Pub. Serv. Auth. of S.C.*, 354 S.C. 397, 406, 581 S.E.2d 161, 166 (2003) ("The necessary elements of a contract are an offer, acceptance, and valuable consideration."). Like the formation of a contract, "[a] modification of a written contract must fulfill all of the elements required for a valid contract." *Roberts v. Gaskins*, 327 S.C. 478, 483, 486 S.E.2d 771, 773 (Ct. App. 1997). In other words, "[a]ny modification of a written contract must satisfy all fundamental elements of a valid contract in order for it to be enforceable, including a meeting of the minds between the parties with regard to all essential terms of the agreement." *ESA Servs., LLC v. S.C. Dep't of Revenue*, 392 S.C. 11, 23, 707 S.E.2d 431, 438 (Ct. App. 2011).

The Court finds that CO1 is a binding contract. CO1 undisputedly provides that "[Defendant OBG] reserves the right to rescind [CO1] pending an audit of [Plaintiff's] scope-of-work, unit pricing, and final costs" and that Defendant OBG will authorize all work "in phases." (Dkt. No. 85-3 at 2-3). Per the Subcontract,[4] when Plaintiff signed CO1, its signature

---

[4] No party disputes that the Subcontract is a valid contract. *See generally* (Dkt. Nos. 84 and 86).

"constitute[d] conclusive evidence of the [its] agreement of the ordered changes." (Dkt. No. 86-3 § 16.7). Therefore, when Defendant OBG signed CO1 and struck line item 4, allegedly because Plaintiff had provided an inadequate waler design, Defendant OBG was within its right to do so. *See* (Dkt. No. 85-3 at 2-3) (reserving to Defendant OBG the right to "rescind [CO1] pending an audit of [Plaintiff's] scope-of-work, unit pricing, and final costs" and noting work would be authorized in phases); *see also* (Dkt. No. 86-3 § 1.8) (requiring that "[d]rawings prepared, or caused to be prepared by [Plaintiff], including standard or stock equipment drawings necessary to the performance of the work on the Principal Contract or as may be required by the Engineer [are] *to be submitted for approval*" (emphasis added). Put simply, upon signing CO1, Defendant OBG was within its right to rescind—or not authorize—line item 4.

In contesting the above line of reasoning, Plaintiff argues that there was "no meeting of the minds" as to CO1 because Defendant OBG's striking line item 4 of CO1 constituted a counteroffer which Plaintiff never accepted. *See* (Dkt. No. 85 at 4-9); (Dkt. No. 90 at 4-8); *see also Connelly Mgmt., Inc. v. Claro*, No. CV 2:03-3005-PMD, 2006 WL 8443508, at *2 (D.S.C. May 11, 2006) ("A counter-offer is an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer.") (citing Restatements (2d) Contracts § 39).

The Court finds Plaintiff's argument that there was "no meeting of the minds" as to CO1 unconvincing. Plaintiff's reasoning ignores that specific contractual provisions in CO1 and the Subcontract provide Defendant OBG with the final authority to rescind work and authorize that it be performed in phases. In sum, upon signing CO1 and striking line item 4, Defendant OBG was asserting a contractual right which Plaintiff had agreed belonged to Defendant OBG. *See* (Dkt. No. 85-3 at 2-3) (reserving to Defendant OBG the right to "rescind [CO1] pending an audit of

[Plaintiff's] scope-of-work, unit pricing, and final costs" and noting work would be authorized in phases); *see also* (Dkt. No. 86-3 § 1.8) (requiring that "[d]rawings prepared, or caused to be prepared by [Plaintiff], including standard or stock equipment drawings necessary to the performance of the work on the Principal Contract or as may be required by the Engineer [are] *to be submitted for approval*" (emphasis added).

In sum, the Court finds that CO1 is a binding contract. The Court therefore grants Defendants' motion for summary judgment on Plaintiff's claim for breach of contract to the extent that Plaintiff's claim for breach of contract is limited to no more than $1,885,604.27 for the work it performed pursuant to CO1. Relatedly, the Court denies Plaintiff's motion for summary judgment to the extent it seeks dismissal of Defendants' breach of contract claims.

### b. Plaintiff's Claim for Unjust Enrichment *Quantum Meruit*

Defendants argue that because a valid contract—namely CO1—governs this dispute, relief under a theory of *quantum meruit* is unavailable to Plaintiff. Plaintiff argues otherwise.

To prevail on a *quantum meruit* claim, a plaintiff must establish that: (1) it conferred a benefit upon the defendant; (2) the defendant realized that benefit; and (3) retention of the benefit by the defendant under the circumstances make it inequitable for the defendant to retain it without paying its value. *E.g., Swanson v. Stratos*, 564 S.E.2d 117, 119 (S.C. Ct. App. 2012).

The Court finds that relief under a *quantum meruit* theory is unavailable to Plaintiff. "Relief under a theory of *quantum meruit* is not available if a party bases its action on the existence of a contract." *Limehouse v. Resol. Tr. Corp.*, 862 F. Supp. 97, 103 (D.S.C. 1994); *Blanton v. Friedberg,* 819 F.2d 489 (4th Cir.1987) (under South Carolina law, normally "damages for breach of contract and recovery for *quantum meruit* are mutually exclusive remedies"); *see also Bright v. QSP, Inc.,* 20 F.3d 1300, 1306 (4th Cir. 1994) (there can be no quasi-contractual recovery where

-10-

there is an express contract covering the same subject matter). Here, the Court has found that CO1 is a valid contract which the parties have not abandoned or rescinded. Thus, the Court grants Defendants' motion for summary judgment on Plaintiff's *quantum meruit* claim. *See Gibson v. Epting*, 827 S.E.2d 178, 183 (S.C. Ct. App. 2019) (affirming grant of summary judgment and noting that "Gibson also claims *quantum meruit*, the equitable remedy for unjust enrichment, but that cause of action cannot undo what she agreed to do in the fee agreement. . . . As we have held the November fee unambiguous as a matter of law, Gibson cannot now claim unjust enrichment. A party cannot disavow a binding contract and pursue *quantum meruit*, no matter how green the grass of equity may seem"); *Eldeco, Inc. v. LPS Const. Co.*, No. C.A. 3:08-2295-CMC, 2009 WL 4586003, at *5 (D.S.C. Dec. 1, 2009) ("[T]he court concludes that Eldeco's right to recovery of EFOC arises in contract and cannot be maintained under a *quantum meruit* theory. As explained in *Swanson:* 'If the tasks the plaintiff is seeking compensation for under a *quantum meruit* theory are encompassed within the terms of an express contract which has not been abandoned or rescinded, the plaintiff may not recover under *quantum meruit*.'").

    **c. Plaintiff's Claim on a Lien Bond**

Next, the Court turns to Defendants' argument that it is entitled to summary judgment on Plaintiff's claim for suit on a lien bond. Specifically, Defendants argue that because the Amended Lien seeks payment for work for line item 4 of CO1—work which Plaintiff admits it did not perform—Plaintiff knowingly overstated the value of Amended Lien. (Dkt. No. 86-1 at 21).

"To perfect and enforce a lien, one must timely complete the following three steps found in sections 29-5-90 and 29-5-120 of the South Carolina Code: (1) serve and file a notice or certificate of the line, (2) commence a lawsuit to enforce the lien, and (3) file a lis pendens." *Ferguson Fire and Fabrication, Inc. v. Preferred Fire Prot., L.L.C.*, 762 S.E.2d 561, 566 (S.C.

2014.). Where "it appear[s] that the person filing the [lien] has willfully and knowingly claimed more than is his due," however, the court may invalidate a lien. § 29-5-100.

The Court grants Defendants summary judgment on Plaintiff's claim on a lien bond. *See Cobb v. Maccaro*, 423 S.E.2d 156, 157 (S.C. Ct. App. 1992) (noting the "statutory authority to dissolve a lien is in the nature of summary judgment because it is only available when there is no genuine issue of material fact"). As noted *supra*, the Court finds that CO1—as modified by Defendant OBG and thus excluding line item 4—is a binding contract. Further, the undisputed facts show that Plaintiff did not perform work associated with line item 4 of CO1. *See* (Dkt. No. 86-9 at 5). Thus, the Amended Lien is overstated in that it seeks $2,205,102.00 for work which Plaintiff admittedly did not perform. *See Terlizzi Home Improvement, LLC v. Boheler*, No. 2014-002540, 2017 WL 4786434, at *2 (S.C. Ct. App. July 5, 2017) (affirming grant of summary judgment discharging mechanic's lien where plaintiff testified "he did not use the actual costs of materials and labor involved in the construction of Respondents' home to calculate the sum of the lien" and could only account for a sum less than the value of the lien). Accordingly, the Court discharges the Amended Lien. *See Sea Pines Co. v. Kiawah Island Co., Inc.*, 268 S.C. 153, 232 S.E.2d 501 (1977) (holding that a trial judge has the authority to vacate a mechanic's lien).

### d. Plaintiff's Claim for Failure to Investigate

Next, the Court addresses Defendants' argument that they are entitled to summary judgment on Plaintiff's claim for failure to investigate pursuant to S.C. Code Ann. § 27-1-15. Specifically, Defendants argue that the undisputed evidence before the Court establishes that Defendant OBG's investigation of Plaintiff's April 4, 2019 letter was "reasonable" and that Plaintiff's contention to the contrary expresses little more than disagreement with Defendant OBG's conclusions. (Dkt. No. 86 at 24-26); (Dkt. No. 93 at 10-11).

> Section 27-1-15 of the South Carolina Code provides that:
>
> Whenever a contractor, laborer, design professional, or materials supplier has expended labor, services, or materials under contract for the improvement of real property, and where due and just demand has been made by certified or registered mail for payment for the labor, services, or materials under the terms of any regulation, undertaking, or statute, it is the duty of the person upon whom the claim is made to make a reasonable and fair investigation of the merits of the claim and to pay it, or whatever portion of it is determined as valid, within forty-five days from the date of mailing the demand. If the person fails to make a fair investigation or otherwise unreasonably refuses to pay the claim or proper portion, he is liable for reasonable attorney's fees and interest at the judgment rate from the date of the demand.

S.C. Code Ann. § 21-1-15. The party seeking an award of attorney's fees and interest under the statute has the initial burden of presenting prima facie evidence that the opposing party did not make a fair and reasonable investigation. *Moore Elec. Supply, Inc. v. Ward,* 316 S.C. 367, 374–75, 450 S.E.2d 96, 100 (Ct. App. 1994). Whether a party's steps taken were "reasonable and fair" is a question of fact. *Id.*

In opposing Defendants' motion for summary judgment and in arguing that Defendant OBG's investigation was unreasonable, Plaintiff advances two arguments.  First, Plaintiff argues Defendant OBG's investigation was unreasonable because it assumed CO1 was a binding contract. *See* (Dkt. No. 90 at 11) ("[Defendant OBG's] responses to [Plaintiff's] demand conveyed [Defendant OBG's] unreasonable position that it can impose the altered Change Order No. 1 document on [Plaintiff]. However, any fair investigation . . .would have revealed that [Plaintiff] never accepted Change Order No. 1 *after* [Defendant OBG's] unilateral modification of the essential terms.")  Second, Plaintiff argues:

> [A]ny fair investigation performed by [Defendant OBG] would have revealed that [Plaintiff's] efforts to perform the additional work authorized by [Defendant OBG] was tracked by [Plaintiff's] field tickets which were submitted to and signed by [Defendant OBG]. Rather than compensate Plaintiff based upon those signed tickets, [Defendant OBG] has refused to pay for any of the labor or equipment expended to perform the extra work. [Defendant OBG] instead has asserted its own

-13-

> affirmative claim that [Plaintiff] owes [Defendant OBG] for delay damages. While the cause of the delays is an issue of fact for trial, [Plaintiff] submits that such facts will establish that [Defendant OBG's] rejection of [Plaintiff's] demand in its entirety was patently unreasonable.

(Dkt. No. 90 at 12). In arguing the above, Plaintiff cites to no record evidence. (*Id.*).

The Court grants Defendants summary judgment on Plaintiff's failure to investigate claim. "[A]s the party seeking the award of attorney's fees and interest under the statute, [Plaintiff] ha[s] the initial burden of presenting prima facie evidence that [Defendant OBG] did not make a fair and reasonable investigation." *Moore Elec. Supply, Inc. v. Ward*, 316 S.C. 367, 374–75, 450 S.E.2d 96, 100 (Ct. App. 1994). Here, as in *Ward*, Plaintiff has put forth no record evidence establish to establish a prima facie case that Defendant OBG's investigation was unreasonable. *See id.* ("Because this was an issue in the case, Moore Electric could have used discovery to ascertain the scope of St. Paul's investigation and presented the evidence to the trier of fact to determine whether the steps taken were 'reasonable and fair.' Since Moore Electric presented no evidence on this issue, it failed to bear its burden of proof."). At heart, while Plaintiff voices disagreement with the conclusions of Defendant's OBG's investigation of Plaintiff's demand letter, it cites to no evidence from which a trier of fact could infer that Defendant OBG's *investigation itself* was unreasonable.

Accordingly, the Court grants Defendants summary judgment on Plaintiff's failure to investigate claim.

### e. Whether Defendants Must Present Expert Evidence to Support Their Claims for Breach of Contract

Last, the Court address Plaintiff's contention that Defendants cannot establish that Plaintiff furnished an inadequate waler design for the cofferdam system due to a lack of expert testimony on the subject.

Specifically, Plaintiff notes that Defendant OBG argues in these proceedings that it struck line item 4 from CO1 because Plaintiff "allegedly failed to provide adequate waler design for the sheet pile cofferdam system." (Dkt. No. 85 at 10); *see* (Dkt. No. 50 ¶ 145) ("[Plaintiff] also submitted a waler design that proved unworkable, and that improper design further delayed both the completion of its work and the overall Project progression"); (*Id.* ¶¶ 157-159) (alleging that Plaintiff "failed to timely provide a waler design" and "[b]y submitting an untimely and defective waler design, [Plaintiff] delayed the Project and caused [Defendant OBG] to incur substantial damages"). Plaintiff argues that Defendant OBG must submit expert testimony to support these allegations. *See* (Dkt. No. 85 at 10) (arguing that Defendants must submit "engineering [or] constructability analyses of the waler design furnished by [Plaintiff]" to prove said allegations). In support of this argument, Plaintiff notes that Defendant' expert Frank Giunta, who is being "offered by [Defendants] as a scheduling expert, has not performed any engineering analysis regarding the adequacy of the waler design for the sheet-pile cofferdam system furnished by [Plaintiff]." (*Id.* at 12) (noting "Mr. Giunta does not opine as to the buildability or constructability of the design submitted by [Plaintiff]").

Defendants, for their part, argue that no expert testimony is required to support the allegation that Plaintiff furnished an inadequate waler design. Defendants note that, per the Subcontract, drawings for any work performed by Plaintiff, whether as part of base work or change order work, required the approval of Defendant OBG. *See* (Dkt. No. 86-3 § 1.8) ("Drawings prepared, or caused to be prepared by [Plaintiff], including standard or stock equipment drawings necessary to the performance of the work on the Principal Contract or as may be required by the Engineer to be submitted for approval.") Defendants also argue that "[n]owhere does the Subcontract require [Defendant OBG] to provide expert support for its decision to approve or

reject designs furnished by [Plaintiff] or changes in the scope of work. In fact, the Subcontract does not require [Defendant OBG] to provide any support at all." (Dkt. No. 92 at 19). Additionally, Defendants argue that Plaintiff's "failure to provide an adequate design" is not a "technically complex" question that necessitates expert testimony.[5]

"Whether expert testimony is required is a question of law." *Graves v. CAS Med. Sys., Inc.*, 401 S.C. 63, 81, 735 S.E.2d 650, 659 (2012). To that end, "expert evidence is required where a factual issue must be resolved with scientific, technical, or any other specialized knowledge." *Watson v. Ford Motor Co.*, 389 S.C. 434, 445, 699 S.E.2d 169, 175 (2010). *See Hickerson v. Yamaha Motor Corp., U.S.A.*, No. 8:13-cv-2311, 2016 WL 4367141, at *3 (D.S.C. Aug. 16, 2016) ("South Carolina law requires expert evidence where 'a factual issue must be resolved with scientific, technical, or any other specialized knowledge.'")

The Court finds that Defendants are not required to present expert evidence to prove the allegation that Plaintiff furnished inadequate waler designs. First, the Subcontract explicitly gives Defendant OBG the discretion to approve or reject designs furnished by Plaintiff and does not require Defendant OBG to provide any reason—much less expert testimony—in exercising that discretion. *See* (Dkt. No. 86-3 §1.8). Second, the Court finds instructive *Penzel Constr. Co v. Jackson R-2 Sch. Dist.*, 544 S.W.3d 214 (Mo. Ct. App. 2017).[6] There the court held that even

---

[5] To this effect, Defendants rely on the testimony of OBG employee Doug Feeney. Defendants argue, "The allegations in [Defendant OBG's] Counterclaim that [Plaintiff's] design for the walers was untimely and unworkable . . . are not beyond the understanding of a lay person. OBG's Doug Feeney testified that [Plaintiff's] proposed waler design was not workable because 'the crisscross of walers within the pit would impede the ability to do the foundations within the expectations of the design and the requirements by the equipment manufacturer.' Furthermore, a follow-on contractor, Cianbro 'could not have interior walers. Those walers had to be on the outside for them to do their work; or they had to have [an] unobstructed area . . . .'" (Dkt. No. 92 at 21) (internal citations omitted).

[6] Missouri's standard for expert testimony, which is required "when a fact at issue is so technical or complex that no fact-finder could resolve the issue without it," *Penzel Constr. Co., Inc. v.*

technical engineering concepts were not so complex that they required expert testimony to establish the inadequacy of plans and specifications on a construction project:

> Although electrical engineering is highly technical and complicated in general, most of the problems alleged by Penzel, and testified about by its witnesses, were simple enough for a layperson to understand. For example, testimony that the Plans omitted critical components, called for outdated or non-existent products, and failed to comply with building codes are issues a layperson without any technical training could understand. Accordingly, Penzel was not required to produce expert testimony to prove the Plans were substantially deficient.

544 S.W.3d at 229. Here, as in *Penzel*, the "defects" Defendant OBG alleges existed in Plaintiff's waler system design are generally understandable. Namely, Defendant OBG alleges it requested an "exterior tieback system" that would allow for "unimpeded access to the deep concrete foundations" and Plaintiff, by contrast, proposed an interior support system. (Dkt. No. 92 at 21-22) (testimony of Defendant OBG Senior Project Manager Robert Pazdur that "[i]nstalling these cross braces as they are shown, you can't get in and pour the foundation sequentially like they need to be poured. You would have to put additional joints and ties so that you could remove the whalers out of the way to keep coming up. This is—to construct the concrete foundation based on [SIC's proposal] would probably add double the time and at least 50 percent more cost").

Accordingly, the Court denies Plaintiff's motion on the above point.

### IV. Conclusion

For the foregoing reasons, the Court **DENIES** Plaintiff's motion for partial summary judgment (Dkt. No. 84) and **GRANTS** Defendants' motion for partial summary judgment. (Dkt. No. 86). Specifically, the Court **GRANTS** Defendants summary judgment on Plaintiff's claims

---

*Jackson R-2 Sch. Dist.*, 544 S.W.3d 214, 229 (Mo. Ct. App. 2017), is substantially similar to South Carolina's standard, *see Watson v. Ford Motor Co.*, 389 S.C. 434, 445, 699 S.E.2d 169, 175 (2010) (finding that "expert evidence is required where a factual issue must be resolved with scientific, technical, or any other specialized knowledge).

-18-

for *quantum meruit*, lien on a bond, failure to investigate, and intentional interference with prospective contractual relations. The Court further **GRANTS** Defendants' motion for partial summary judgment on Plaintiff's claim for breach of contract to the extent that said claim is limited to no more than $1,885,604.27 for the work Plaintiff performed pursuant to Change Order 1.

    **AND IT IS SO ORDERED.**

<u>s/ Richard Mark Gergel</u><br>
United States District Judge

April 12, 2021<br>
Charleston, South Carolina